UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 4:24-CR-555-MAL-SPM |
| | ) | |
| RONALD M. TROUPE, | ) | |
| | ) | |
| Defendant. | ) | |

**REPORT AND RECOMMENDATION AND**
**MEMORANDUM OPINION OF UNITED STATES MAGISTRATE JUDGE**

On October 23, 2024, a Grand Jury returned an indictment charging Defendant Ronald M. Troupe with one count of being a felon in possession of a firearm on or about September 28, 2024, in violation of 18 U.S.C. §922(g). ECF No. 2. All pretrial matters in the above-referenced case were referred to the undersigned United States Magistrate Judge pursuant to 28 U.S.C. § 636(b). On June 5, 2025, Troupe filed a motion to suppress the firearm seized by police on September 28, 2024, and any statements he made at the time. ECF No. 32. The United States responded opposing the motion. ECF Nos. 35.

On July 23, 2025, the undersigned held an evidentiary hearing on Troupe's motion. The United States offered testimony of St. Louis Metropolitan Police Department Officer Tiarra McFarland and nine exhibits consisting of digital recordings of a 911 call, police radio traffic, recorded body camera and dashboard camera video, and documents related to the events of Troupe's arrest on September 28, 2024. *See* Govt. Exhs. 1-9. Counsel for Troupe cross examined Officer McFarland but otherwise offered no additional witness testimony or evidence. At the close of the evidentiary hearing the parties were granted time to request a transcript of the hearing and to file post-hearing briefs.  The transcript of the evidentiary hearing was filed on

August 13, 2025, ECF No. 42, and post hearing briefing was completed on October 31, 2025. *See* ECF Nos. 47 & 52.

The undersigned has carefully considered all evidence that was offered and admitted at the evidentiary hearing. The undersigned has also considered the arguments of the parties in their written submissions. Based upon the evidence adduced at the hearing and the written submissions of the parties, the undersigned makes the following findings of fact and conclusions of law.

I. **FINDINGS OF FACT**

On September 28, 2024, at 11:42 A.M., St. Louis Metropolitan Police Department ("SLMPD") Officers Tiarra McFarland and Rebekah Saito were dispatched to a gas station in the city of St. Louis in response to a 911 call. *See* Evid. Hrng. Tr., ECF No. 42 at p. 8-9; *see also* Govt. Exhs. 2 & 3. The dispatch advised that an unidentified caller reported that a black male, occupying a grey truck, who goes by the nickname of "Que", was harassing a black female, wearing a dark shirt and blue jeans, on the gas station lot. *See* ECF No. 42, at p. 10-11; Govt. Exhs. 2&3. The officers were also informed that the 911 call might be related to a call received by dispatch the previous day, September 27. Specifically, the officers were told that on the previous day dispatch received a call from a victim at the same gas station asserting "Que just punched her in the face and took $30 from her." *See* ECF No. 42, at p. 12-14; Govt. Ex. 4.

Officer McFarland was familiar with the gas station referenced by dispatch. ECF No. 42, at p. 21. She testified that the gas station was in a high crime area, and she had been called to that gas station over a thousand times in response to 911 calls for a variety of criminal activity including assaults, strong-arm robberies, burglaries, and homicides. ECF No. 42, at p. 21. She explained that the gas station, which had previously been a Mobil gas station, had been given the

nickname "Murder Mobil" due to a history of homicides and murders police encountered on that gas station lot. *Id.* at p. 22.

Officer McFarland, who was driving separately from Officer Saito, arrived at the gas station at approximately 11:58AM. *See* ECF No. 42, at p. 42. As she approached the gas station, Officer McFarland saw three vehicles on the lot. One of the vehicles she recognized as a car owned by the gas station manager. *Id.* at p. 25. The other two vehicles were a light gray/silver sedan and the defendant's two-toned gray van. *Id.* Officer McFarland's attention was drawn to the van (instead of the sedan) because of the report from dispatch that the suspect was driving a gray "truck" and because she was aware that it was not unusual for people to use the word "truck" to describe larger vehicles such as a van or sports utility vehicles. *Id.* at p. 19-20 & 25-26.

As she approached the gas station, Officer McFarland saw two black males, one later identified as the defendant, walking out of the convenience store of the gas station towards the van. *Id.* at p. 23-24. When the men began to enter the van, Officer McFarland radioed Officer Saito, who was *en route*, to advise that she was going to conduct a stop to inquire about the 911call. *Id.* at 26-28; Govt. Exh. 5 (McFarland body camera video footage), 1:04 to 1:06.

Officer McFarland pulled her police vehicle behind the van, activated her lights, and approached the defendant while he was standing outside the driver's side door. She asked the defendant his name and when he responded by saying "I just pulled up from the scrapyard," she said, "let me detain you real quick." *Id.* at 1:06 to 1:54. Defendant, visibly alarmed, started asking the officer what he did.  Officer Saito, who had arrived and was standing in front of the van, explained that they were doing an investigation. *Id.* at 1:54 to 2:02. Officer McFarland

advised the defendant he was not under arrest but he was being detained so that they could "ask questions;" she urged him to not resist. Govt. Exh. 5, at 1:54 to 2:02.

Officer McFarland secured defendant's hands with restraints and asked him to follow her to her car. *Id.* at 2:02 to 2:39. As they approached her police vehicle, for officer safety, Officer McFarland asked the defendant to confirm that he didn't have anything that would poke or hurt her; in response, the defendant began insisting that Officer McFarland was going to take him to jail. *Id.* at 2:39 to 2:48. *See also* ECF No. 42, at p. 61-62. Despite Officer McFarland's attempts to reassure the defendant that her intention was not to take him to jail, the defendant insisted that she was going to take him to jail because he was "going to tell [the officer] the truth about what [he had] on him." Govt. Exh. 5, at 2:48 to 2:49. Officer McFarland asked the defendant "what do you have on you?" and he responded by repeatedly saying while sobbing "please don't take me to jail baby," "you're going to send me to prison." *Id.* at 2:50 to 3:46.

During her frisk of the defendant, Officer McFarland seized a gun from his waistband and handed it to Officer Saito; meanwhile, the defendant continued to sob saying "y'all going to take me to prison." *Id.* Officer McFarland tried to get the defendant to calm down saying "sir, this is just an investigation right now" and words to that effect. *Id.* at 3:46 to 4:00. Defendant continued sobbing, stating they were going to "take [him] to jail for the gun," "I'm going back to the penitentiary" and "y'all fittin to put me in jail for the rest of my life" and "I'm going to die in jail." *Id.* at 4:00 to 7:30.

In the interim, other officers took the defendant's identification and firearm and performed computer inquiries. *See id.* at 06:10. Approximately ten minutes into the encounter Officer Saito returned to Officer McFarland and informed her that the firearm was previously reported as stolen, and that other officers were still trying to confirm whether the defendant was

a convicted felon. Govt. Exh. 5, at 10:02 to 10:14. At that point, Officer McFarland asked Officer Saito if she should "Mirandize now?" and Officer Saito responded by saying, "yes, I would." *Id.* at 10:16. The defendant overheard the two officer's conversation and said, "I already know you're going to read me my rights," and Officer McFarland confirmed and told the defendant she was going to advise him of his Miranda rights. *Id.* at 10:20 to 10:24. In response, the defendant screamed and ran to the other side of Officer McFarland's car. *Id.* at 10:24 to 10:28. She followed him and read the defendant his Miranda rights while he dropped to the ground, and screamed "no, no, no", and cried even louder than before, that he was "going to die in prison." *Id.* at 10:37 to 11:23.

After Officer McFarland finished reading the defendant his Miranda rights, a male officer who had arrived on scene accused the defendant of "acting like a child." *Id.* at 11:23 to 14:25. The defendant told the officer "I'm going to prison, man [because of the firearm]" and the officer replied, "[w]hy would you, what's wrong with having a gun? It's the state of Missouri?" The defendant answered, "I'm a convicted felon." *Id.* at 14:25 to 15:04.

## II. DISCUSSION

Troupe asserts the gun seized by police and any incriminating statements he made should be suppressed because police obtained them in violation of his rights under the Fourth and Fifth Amendments. Specifically, Troupe asserts Officer McFarland violated the Fourth Amendment by detaining him without reasonable suspicion or probable cause and by exceeding the scope of an investigatory detention. *See* ECF No. 32. Troupe contends Officer McFarland also violated the Fifth Amendment by obtaining statements from him without advising him of his Fifth Amendment right to remain silent. *Id.*

### A. FOURTH AMENDMENT VIOLATIONS

The Fourth Amendment protects people against unreasonable government seizures. U.S. Const. amend. IV ("[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated"). For Fourth Amendment purposes, a seizure occurs whenever an officer restrains an individual's liberty by physical force or a show of authority to which the individual submits. *California v. Hodari D.*, 499 U.S. 621, 626 (1991). If unreasonable under the circumstances, such seizures violate the Fourth Amendment.

Based on the foregoing factual findings, Troupe was seized for Fourth Amendment purposes when Officer McFarland approached him, stated she was going to "detain" him "real quick," and placed him in handcuffs. When Troupe asked why he was being detained, the officers told him they were investigating a call. In *Terry v. Ohio,* 392 U.S. 1, 28-31 (1968), the Supreme Court held that brief seizures by police that fall short of traditional arrests are lawful if justified by a reasonable suspicion that an individual is engaged in criminal activity and if police activities during the investigatory stop are reasonably related to the circumstances that initially justified the stop. *See also Rodriguez v. United States,* 135 S. Ct. 1609, 1615 (2015). "Reasonable suspicion requires that the officers' suspicion be based upon particularized objective facts which, taken together with rational inferences from those facts, reasonably warrant suspicion that a crime has been committed." *United States v. Smith,* 648 F.3d 654, 658 (8th Cir. 2011) (internal citations omitted). An "inchoate and unparticularized suspicion or hunch" is insufficient. *Terry,* 392 U.S. at 27 (internal quotation marks omitted).

In determining whether the requisite degree of suspicion exists, the court must determine whether the facts collectively establish reasonable suspicion and not whether each fact establishes reasonable suspicion—the whole picture, i.e., the "totality of the circumstances" must be

considered. *See United States v. Linkous*, 285 F.3d 716, 720 (8th Cir. 2002); *United States v. Jones*, 269 F.3d 919, 927 (8th Cir. 2001). The court may consider any added meaning that certain conduct might suggest to experienced officers in the field, but the officer's reasonable suspicion cannot be "just a mere hunch or based on circumstances which 'describe a very large category of presumably innocent [people].'" *Jones,* 269 F.3d at 927 (quoting *Reid v. Georgia,* 448 U.S. 428, 441 (1980)).

### 1. *The officers had reasonable suspicion to briefly detain Troupe.*

Officer McFarland did not seize Troupe based on an unparticularized suspicion or hunch. She and her partner, Officer Saito, were dispatched to the gas station to search for and question a black male named Que who, according to a 911 caller, had been harassing a woman at the gas station approximately twenty minutes before Officer McFarland arrived. Officer McFarland also knew police had been dispatched to the same gas station the day before in response to a call from a female victim accusing the same subject, "Que," of assaulting and robbing her. The assailant was reportedly seen in a gray "truck" on both days and had managed to evade police the day before so presumably was still at large.

When she arrived at the gas station, Officer McFarland saw only three vehicles on the parking lot—two sedans and Troupe's van which was gray. Officer McFarland recognized one of the sedans as a car owned by the gas station manager. She focused on Troupe's van and not the other sedan because she knew it was not uncommon for individuals—especially in a hurry or under stress—to describe a van as a truck. Officer McFarland was also familiar with the gas station. Not only was Officer McFarland aware that the gas station was in a high crime area, but based on her experience working in that area, Officer McFarland had responded to other 911 calls to that gas station numerous times for a variety of criminal activity including assaults, strong-arm robberies, burglaries, and homicides. She explained that the gas station, which had

previously been a Mobil gas station, had been given the nickname "Murder Mobil" due to a history of homicides and murders police encountered on that gas station lot.

When she approached the defendant, Officer McFarland activated the lights on her police vehicle and got out. She did not draw her weapon or raise her voice. Instead, she calmly approached the defendant and asked him for his name. Although Troupe's name and identification may have been sufficient to start to dissipate any suspicion that he was the subject police was looking for, Troupe did not provide his name. Instead, he immediately began explaining that he had just arrived at the gas station, had not done anything, etc. At that point, Officer McFarland responded that she was going to detain him and, together with Officer Saito—the only other officer at the scene— began attempting to explain that Troupe was *not* under arrest, and they were trying to investigate alleged criminal conduct.

Based on the facts known to Officer McFarland at the time, it was reasonable for her to suspect that Troupe was "Que" and to approach him to either confirm or refute that suspicion. The facts known to the officer specifically about the assailant in the 911 call and, generally, about the gas station and surrounding area, also made it reasonable for her to approach any suspect matching the description from dispatch with extreme caution.

Defendant argues the officers lacked reasonable suspicion because the call was made by an anonymous and, by implication, unreliable tipster. While a call from an anonymous tipster, in isolation, may not have been sufficient to constitute reasonable suspicion, Officer McFarland did not rely solely on the 911 call. Instead, in deciding to detain Troupe, she relied on the tip and her own observations once she arrived at the gas station (i.e., back male, present at the gas station in a large gray vehicle some might describe as a truck, and Defendant's reluctance to give his name). Defendant also suggests the officer lacked reasonable suspicion because there were discrepancies

between his van and the descriptions given to the officers by police dispatch. However, the discrepancies between the description in the 911 call and Officer McFarland's observations were minor and when all of the other circumstances are considered, the officer had sufficient reasonable suspicion to justify briefly detaining the defendant to further investigate whether he was the individual who was the subject of two successive 911 calls.

### 2. *Police did not exceed the scope of an investigatory detention.*

Troupe contends the officers exceeded the scope of an investigatory detention by placing him in handcuffs and frisking him when the circumstances did not justify the use of handcuffs or a frisk. Troupe cites the Eighth Circuit's decision in *El-Ghazzawy v. Berthiaume*, 636 F.3d 452 (8th Cir. 2011) in support of his position. In *El-Ghazzawy*, which was a civil rights case brought under §1983, the Eighth Circuit held that an officer's handcuffing and frisk of a man suspected of theft by swindle immediately upon encountering him violated his Fourth Amendment rights because "there was nothing in the dispatch [to police] to indicate [the suspect] could be armed or dangerous;" because "the crime [the suspect] was suspected of committing, theft by swindle, was not a dangerous crime which would cause concern of him being armed and dangerous;" and because the suspect did not exhibit "erratic or suspicious behavior" during the officer's arrival on the scene. *Id.* at, 457.

Troupe's reliance on *El-Ghazzawy* is misplaced because the facts here are readily distinguishable. Based on the foregoing factual findings, Officer McFarland placed Troupe in handcuffs one or two minutes after first encountering him. At that point, she knew there had been back-to-back 911 calls involving assault, robbery and harassment of a female victim at that gas station, suggesting the assailant she was searching for may be violent. Officer McFarland was also very familiar with the gas station and the surrounding area and had responded to numerous 911

calls from that location to investigate violent crimes. Given her familiarity with the area, it would not be unreasonable for Officer McFarland to assume the assailant may also be armed.

Though not a perfect match, Troupe's van and Troupe himself, fit within the general identifiers provided by dispatch and Troupe's own conduct when Officer McFarland first approached him only heightened the officer's suspicion that he was the assailant she was searching for. Specifically, when Officer McFarland first asked for his name, Troupe repeated the question and then, without giving his name, stated that he just arrived at the gas station from the scrap yard. It would not be unreasonable for the officer to be skeptical of Troupe's statement because, as Officer McFarland testified, when she first observed Troupe, he and the passenger were walking from the convenience store of the gas station toward the van—suggesting Troupe had not, as he stated "just" pulled up. This discrepancy coupled with Troupe's failure or refusal to give his name only heightened the officer's suspicion.

It is well settled that, in conducting an investigatory *Terry*-type stop, "[o]fficers must 'use the least intrusive means of detention and investigation, in terms of scope and duration, that are reasonably necessary to achieve the purpose of the *Terry* stop.'" *United States v. Newell,* 596 F.3d 876, 879 (8th Cir. 2010) (quoting *Terry,* 392 U.S. at 25-31). Where police exceed the permissible scope articulated in *Terry*, the investigatory detention is transformed into an arrest that must be supported by probable cause. *United States v. Aquino*, 674 F.3d 918, 924 (8th Cir. 2012). For example, a *Terry* stop may become an arrest, requiring probable cause, "if the stop lasts for an unreasonably long time or if officers use unreasonable force." *Newell,* 596 F.3d at 879.

However, it is also well-settled that officers may, without converting an investigatory *Terry* stop into an arrest, take any measures that are "reasonably necessary to protect their personal safety and to maintain the status quo during the course of the stop." *Id.* (quoting *United States v. Hensley,*

469 U.S. 221, 235 (1985)). "[W]hen officers are presented with serious danger in the course of carrying out an investigative detention, they may brandish weapons or even constrain the suspect with handcuffs in order to control the scene and protect their safety." *Smith,* 648 F.3d at 654 (quoting *United States v. Fisher,* 364 F.3d 970, 973 (8th Cir. 2004)). *See also United States v. Danielson,* 728 F.2d 1143, 1146-47 (8th Cir.1984) (concluding investigatory detention did not become an arrest when the officers drew their weapons before approaching the vehicle occupied by suspected armed bank robbers). In assessing reasonableness in the context of a *Terry* stop "[t]he Supreme Court has long recognized an officer's right to conduct an investigatory stop inherently includes the right to use some degree of physical force or threat to effect the stop." *El-Ghazzawy*, 636 F.3d at 457 (quoting *Terry*, 392 U.S. at 19-20). Based on the factual findings more fully discussed above, it was objectively reasonable for Officer McFarland to handcuff and frisk the defendant to protect her safety and maintain the status quo while she conducted her investigation.

Finally, to the extent the officers exceeded the scope of an investigatory stop by conducting a check on the gun and Troupe's identification, that expansion was caused by Troupe's own conduct. As the foregoing factual findings demonstrate, from the outset of the encounter Officer McFarland advised Troupe he was not under arrest, and she was investigating a call. She asked him to follow him to her police vehicle and, as they walked toward her police vehicle, Officer McFarland asked if Troupe had anything on him that would "stick" or harm her. This question from Officer McFarland triggered a flood of lamentations from Troupe that lasted for well over ten minutes. Despite the officer's attempt to reassure Troupe that sending him to prison for the rest of his life was not her aim, Troupe engaged in conduct displaying consciousness of guilt: pleading, wailing, falling on the ground, and insisting he would be taken "to the penitentiary" and would "die in jail." Troupe acknowledged he had a gun and Officer McFarland seized it from his

waistband. This conduct, not surprisingly, caused the officers to shift their focus away from the initial purpose of the stop—namely, to determine whether Troupe was the assailant in the 911 call. In other words, there was no Fourth Amendment violation because, considering Troupe's conduct and the totality of the circumstances, police had reasonable suspicion to believe criminal activity was afoot when they expanded the initial investigatory stop to run a check of the gun seized from Troupe and to run a check on Troupe.

### B. Fifth Amendment Violation

Troupe contends Officer McFarland violated the Fifth Amendment when she asked him about what he had on him without advising him of his right to remain silent. ECF No. 32, at p. 14-16. Under the Fifth Amendment, "[n]o person . . . shall be compelled in any criminal case to be a witness against himself." U.S. Const. Amend. V. In *Miranda v. Arizona*, 384 U.S. 436, 448-450, 455 (1966), the Supreme Court recognized that custodial interrogations have the potential to undermine the privilege conferred by the Fifth Amendment against self-incrimination by possibly exposing a suspect to physical or psychological coercion. To guard against such coercion, the Court established a prophylactic procedural mechanism that requires a suspect to receive a warning before any custodial interrogation begins. *Id.* at 444. Unless suspects are warned of their Fifth Amendment rights, any pretrial statements elicited from them are inadmissible at trial. *Id.* at 492. The protections set forth by the United States Supreme Court in *Miranda* are triggered only when a defendant is both in custody and being interrogated. *United States v. Hatten*, 68 F.3d 257, 261 (8th Cir. 1995). For purposes of the Fifth Amendment, "interrogation" includes words or conduct that the officer should know are "reasonably likely to illicit an incriminating response from the suspect." *United States v. Chipps*, 410 F.3d 438, 445 (8th Cir. 2005) (quoting *Rhode Island v. Innis*, 446 U.S. 291, 301 (1980)).

In this case, Troupe contends he was in custody for purposes of *Miranda* when, less than two minutes after she first encountered him, Officer McFarland placed him in handcuffs. ECF No. 32, at p. 14-16. In opposing Troupe's motion, the United States asserts there was no Fifth Amendment violation because Troupe was not in custody for purposes of *Miranda* when he made incriminating statements. ECF No. 35, at p. 13-16. The undersigned need not resolve the parties' dispute over whether Troupe was in custody under *Miranda* because, based on the factual findings, the statements Troupe seeks to suppress fall squarely within the public safety exception to *Miranda* articulated by the Supreme Court in *New York v. Quarles,* 467 U.S. 649 (1984).

Under the public safety exception, even if *Miranda* warnings were not yet given, a suspect's answer may be admitted into evidence if it was obtained in response to a question asked in furtherance of public safety and not designed solely to solicit testimonial evidence. *Quarles,* 467 U.S. at 655–56, 659; *see United States v. Williams,* 181 F.3d 945, 954 n. 13 (8th Cir.1999). The Eighth Circuit has held that the public safety exception "applies when 'police officers ask questions reasonably prompted by a concern for the public safety.'" *Id.* (quoting *United States v. Liddell,* 517 F.3d 1007, 1009 (8th Cir. 2008)). The public to be protected can include the officers themselves and, considering "the risk of police officers being injured by the mishandling of unknown firearms or drug paraphernalia," there is a sufficient public safety basis for officers to ask a suspect who has been arrested and secured whether there are weapons or contraband in a car, apartment, or other place police are about to search. *Liddell,* 517 F.3d at 1009-10 (defendant's statement he knew a gun was in his car fell within the public safety exception where, upon discovering an unloaded pistol in defendant's car, the officers asked him if there was anything else in the car that they needed to know about that could hurt them defendant); *see also United States v. Luker,* 395 F.3d 830, 831-32 (8th Cir.2005) (the public safety exception applied when the

arresting officers, who were aware of the suspect's history of methamphetamine use, asked the suspect before searching his vehicle whether there was anything in it that was not supposed to be there or that could hurt them and suspect responded that his shotgun was in the trunk); *United States v. Everman,* 528 F.3d 570, 572-73 (8th Cir. 2008) (officers' pre-Miranda warning questioning of arrestee about whether he had any weapons on him fell within the public safety exception to Miranda; rangers acted reasonably where the rangers knew that Everman had an associate nearby; rangers were in a remote and isolated area with two men with known criminal records).

In this case, it was objectively reasonable for Officer McFarland to ask Troupe if he had anything on him that might harm her prior questioning him in or near her patrol car. The video evidence shows Troupe was significantly taller and larger than Officer McFarland; so even though he was restrained, it was not unreasonable for Officer McFarland to make sure he was not armed with anything that might harm her before conducting a one-on-one interview. In addition to physical differences between Officer McFarland and Troupe, the information known by Officer McFarland also renders her question to Troupe objectively reasonable under the circumstances. Specifically, Officer McFarland was responding to a 911 call involving a man who had allegedly been harassing a woman at the gas station approximately twenty minutes before Officer McFarland arrived. Officer McFarland also knew police had been dispatched to the same gas station the day before in response to a call from a female victim accusing the same subject, "Que," of assaulting and robbing her. Based on the limited information from dispatch, Officer McFarland had reason to think Troupe may have been Que and, when she asked Troupe for his name, Troupe did not give his name, and his conduct only deepened her suspicions. Officer McFarland was also familiar with the gas station, knew it was in a high crime area, and had responded to other 911 calls at that gas

station for a variety of violent criminal activity. In sum, Troupe's motion to suppress statements should be denied because the question Officer McFarland asked of Troupe was reasonably prompted by a concern for the public safety, including the officer's own safety, and, therefore, falls outside the requirements of *Miranda*.

For all the foregoing reasons,

**IT IS HEREBY RECOMMENDED,** that Defendant's Motion to Suppress Evidence and Statements (ECF No. 32) be **DENIED**.

The parties are advised that they have **fourteen (14)** days in which to file written objections to this report and recommendation pursuant to 28 U.S.C. §636(b)(1), unless an extension of time for good cause is obtained, and that failure to file timely objections may result in a waiver of the right to appeal questions of fact. *See Thompson v. Nix*, 897 F.2d 356 (8th Cir. 1990).

Trial in this case will be set by separate order before the **Honorable Maria A. Lanahan.**

SHIRLEY PADMORE MENSAH
UNITED STATES MAGISTRATE JUDGE

Dated January 16, 2026.